# United States Tax Court

T.C. Memo. 2026-63

WALTER D. PREZIOSO AND KIMBERLY J. PREZIOSO,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 1727-24.                                Filed July 28, 2026.

_____

*Joseph A. Broyles*, for petitioners.

*Lesley A. Hale*, *Brittany M. Reid*, *William Tyler Halasz*, and *Hasan S. Ali*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

PUGH, *Judge*: The Petition in this case seeks redetermination of deficiencies and civil fraud penalties for tax years 2009–13 determined by the Internal Revenue Service (IRS or respondent) in a Notice of Deficiency dated December 20, 2023. Petitioners subsequently conceded the underlying deficiencies for all tax years, as well as the fraud penalty for tax year 2013. The only issues remaining for decision are the fraud penalties for tax years 2009–12 (years in issue).

## FINDINGS OF FACT

The facts we find are drawn from the pleadings, trial testimony, and documents admitted into evidence. Some of the facts have been stipulated and are so found. Petitioners resided in California when they timely filed their Petition.

**[*2]** I.     *GSP Precision, Inc.*

GSP Precision, Inc. (GSP), was an aerospace manufacturing company incorporated under California law in 1983 by George J. Gottardi and Juan Pablo Prezioso, petitioner Walter Prezioso's father. George[1] and Juan Pablo each held a 50% interest in GSP and were members of its board of directors (Board). George's wife, Marta Gottardi, and Juan Pablo's wife, Magdalena Prezioso, also were Board members.

II.     *Petitioners' involvement in GSP*

Walter graduated with a bachelor's degree in computer information systems. Shortly after, Walter joined GSP in 1992. Walter's compensation was reported on Form 1099[2] issued to WDP Computer Programming, an entity Walter formed in 1995.

In 1997 Walter acquired a 25% interest in GSP from his father, paying $25,000 immediately and then $1,500 each month for ten years. Following this purchase, George retained a 50% interest, Juan Pablo held 25%, and Walter held 25%. At that same time Walter was put on GSP's payroll as an employee.

Walter gradually took over the day-to-day management of GSP. On February 27, 2001, the Board adopted a resolution that Walter's was the only signature required for any checks issued by GSP. At another meeting, on June 6, 2002, the Board adopted a resolution that George and Juan Pablo would effectively retire from GSP's day-to-day operations while retaining their shares and status as Board members. It further stated that future employment decisions would be Walter's alone, except for the employment of family members, which required unanimous Board approval.

Around that time, GSP's financials began to worsen. George and Juan Pablo made some loans to GSP, but their desire to make additional loans dissipated. On February 28, 2005, the Board adopted a resolution approving a $50,000 loan from Walter to GSP. Walter also made subsequent loans to GSP. Eventually Walter turned GSP's fortunes

---

[1] To avoid any confusion occasioned by GSP's multigenerational family ownership, we will refer to members of the Prezioso and the Gottardi families by their first names.

[2] The Form 1099 is not in the record, and we do not know which Form 1099 was used.

[*3] around by diversifying its customer base and implementing new technology. Walter became GSP's chief executive officer in 2007.

III.    *GSP's payment of Walter's personal expenses*

Beginning in 2007 GSP began paying certain of Walter's personal expenses. The first Board minutes addressing GSP's payment of Walter's personal expenses, dated December 22, 2009, stated that GSP will "continue to pay personal leased vehicle, vehicle insurance, gas, family medical insurance, Sentry life insurance[,] and credit card expenses for lunch, dinner, customer expenses[,] or company expenses."

GSP paid more of Walter's personal expenses than those explicitly listed in the minutes. For example, GSP paid for personal credit cards, home renovations, a home-equity line of credit, landscaping services, tennis court and pool contractors, and audio/visual equipment. GSP also paid Walter's boat and recreational vehicle loans and leased vehicles on Walter's behalf. For the years in issue GSP issued over 400 checks for Walter's personal expenses. During all the years in issue except 2012, the amounts GSP paid for Walter's personal expenses exceeded the losses reported on its Forms 1120, U.S. Corporation Income Tax Return.

Walter remained on GSP's payroll for his regular salary; GSP paid certain of his personal expenses in lieu of the types of compensation paid to George and Juan Pablo and reported on Forms 1099 issued to them. GSP's payment of Walter's personal expenses was not reported on any Forms W–2, Wage and Tax Statement, or Forms 1099–MISC, Miscellaneous Income, issued to Walter; thus, for the years in issue, these benefits were not subject to payroll taxes or federal income tax reporting. Walter understood that they were compensation, however. On a credit application for a Ferrari lease, Walter listed his income as "Verifiable $52,950 W-2" and "Actual $275,000."

IV.    *GSP's accounting practices*

Walter concealed GSP's payment of many of these personal expenses through bookkeeping practices. John Caven[3] of Caven & Associates served as GSP's outside accountant and tax return preparer. But GSP had no accountant on staff; thus, Walter was primarily responsible for entering checks and invoices into GSP's bookkeeping

---

[3] After Mr. Caven died in 2012, GSP hired another accountant; however, nothing in the record indicates that GSP's bookkeeping processes changed substantially.

[*4] software. This required two relevant steps: entering the payee's identity and assigning an expense code. The software then could be used to produce a chart of accounts that showed the date, the payee, the amount, and the expense code.

As discussed below, Walter's entry of his personal expenses into GSP's books resulted in two sets of charts of accounts for GSP: an internal set provided to GSP shareholders for periodic review (Internal Charts) and an external set provided to Mr. Caven for accounting and tax purposes (Accountant Charts). Each month Walter would send the Accountant Charts, check register, and bank statements to Mr. Caven. Mr. Caven did not receive, and was not aware of, the Internal Charts.

A.    *Payee's identity*

In the Internal Charts Walter commonly disguised the payment of his personal expenses by entering a different payee, usually an existing vendor for GSP. For example, two checks dated February 2, 2011, were made payable to "Chase Card" for $4,093.80 and $3,167.10, respectively. The Internal Charts listed the payees as Cowan Precision Grinding and Quality Heat Treating, Inc., respectively. Other sets of entries listed payees such as Harvey Titanium, Titanium Industries, and Service Steel instead of Chase, the actual payee.

Walter changed the payee's name for his personal expenses even when GSP paid business expenses to the same vendor. For example, GSP issued two checks to Washington Mutual in October 2007. One check issued for GSP's business expenses was recorded in the Internal Charts as payable to Washington Mutual. The other, a personal expense for Walter, was recorded as payable to "A.M. Castle & Co." On other occasions, direct payments from GSP to Walter and Juan Pablo were omitted entirely from the Internal Charts.

When generating the Accountant Charts at the end of each month, Walter's standard practice was to change the payee names on the Internal Charts to the correct payee names. He failed to do so for at least three expenses paid in December 2011, thereby leaving the incorrect payee names from the Internal Charts on the Accountant Charts. After generating the Accountant Charts, Walter would change the payee names back to incorrect ones.

[*5]   B.   *Expense codes*

Mr. Caven provided a list of expense codes for GSP to use for booking expenses in the bookkeeping software. For example, "material purchases" were designated 4710, "outside processing" 4711, "equipment rental" 4715, "equipment repair" 4718, and so on. Mr. Caven also established an expense code for officer compensation, as well as separate codes for each officer's loans to, and draws from, GSP. Mr. Caven did not enter expenses into the bookkeeping software; rather, per Mr. Caven's instructions, Walter (or another GSP employee) was responsible for assigning an expense code to each GSP check. Once an expense was coded and entered into GSP's bookkeeping software, the expense and its classification ordinarily would flow through to the Internal Charts and then the Accountant Charts. These expenses, so classified, were used to prepare GSP's general ledgers, balance sheets, and corporate tax returns.

Walter primarily was responsible for entering expenses into the bookkeeping software and exercised his own judgment regarding the coding of common expenses.[4] For many personal expenses, Walter assigned the expense code for equipment repair. He then modified the expense code to material purchases or outside processing (and added a false payee name) for the Internal Charts. The expense code would be changed back to equipment repair and the correct payee name for generating the Accountant Charts. Other personal expenses, such as Walter's personal Chase credit card charges, were coded as material purchases. The coding of these expenses was not changed for the Accountant Charts.

Expenses coded as material purchases, outside processing, or equipment repair were aggregated on GSP's profit and loss statement as "Cost of Sales." At least some of these expenses ultimately were capitalized as a component of cost of goods sold on GSP's Forms 1120.[5]

---

[4] Mr. Caven occasionally instructed Walter regarding the appropriate coding of certain expenses.

[5] The record is incomplete as to how all of Walter's personal expenses were reported on GSP's Forms 1120, but not one was reported as officer compensation. We note that petitioners' Posttrial Brief conceded that Walter's personal expenses were reported as cost of goods sold for at least some of the years in issue.

**[\*6]** V.     *GSP's bankruptcy and civil actions*

On July 29, 2013, George and Marta filed a shareholder-derivative suit against GSP and both Walter and Juan Pablo in California state court. The suit sought the appointment of a receiver to assume control of GSP, which the court quickly approved. On February 3, 2014, GSP, acting through its receiver, filed a voluntary petition for bankruptcy protection. The shareholder-derivative suit was dismissed in 2019.

VI.     *Returns and Notices of Deficiency*

Petitioners timely filed their Forms 1040, U.S. Individual Income Tax Return, for all tax years in issue. Petitioners' 2009–11 returns were prepared by Mr. Caven; their 2012 and 2013 returns were prepared by King Alleman & Jensen LLP. Petitioners reported Walter's salary as listed on Forms W–2 issued by GSP, but they did not report any income attributable to GSP's payment of their personal expenses.

GSP's Forms 1120 for tax years 2009–11 were prepared by Mr. Caven. Walter executed these returns on behalf of GSP. After Mr. Caven's death, GSP's Forms 1120 were prepared by Hahn, Fife & Co., LLP, for tax years 2012 and 2013; these returns were executed by GSP's receiver.

On December 20, 2023, the IRS issued two Notices of Deficiency, determining deficiencies and civil fraud penalties for all years in issue. Group Manager Anet Magadamyan approved the assertion of the civil fraud penalties by executing a Civil Penalty Approval Form on July 9, 2021.

VII.     *Criminal case*

In 2017 Walter was indicted by a grand jury on eight counts of willfully subscribing a false tax return for each of tax years 2009–13 in violation of section 7206(1)[6] and one count of obstruction of justice in violation of 18 U.S.C. § 1503(a). The jury in his first trial could not reach a verdict.

---

[6] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*7]** After a second trial in November 2017, a jury convicted Walter of one count of willfully subscribing a false tax return for tax year 2013 but found him not guilty of the seven remaining counts.[7]

OPINION

## I. *Fernando Gottardi's testimony*

We begin with one remaining evidentiary issue: the admissibility of testimony by George's son, Fernando Gottardi. In 2013 Fernando sought employment with GSP and was rebuffed by Walter. Following this disagreement, Fernando examined GSP's financials and identified some of the discrepancies highlighted above. This analysis led to George and Marta's filing the shareholder-derivative suit against GSP, Walter, and Juan Pablo.

Respondent filed a Motion in Limine asking us to admit Fernando's testimony. We permitted Fernando to testify, but deferred ruling on admissibility, particularly its relevance.

Aside from many statements that constituted hearsay, Fernando's testimony primarily addressed his 2013 inquiry into GSP's finances. Respondent claims his investigation gives context to the shareholder-derivative suit and is relevant to evaluating Walter's credibility. But respondent failed to establish that Fernando had firsthand knowledge of any relevant facts. *See Colvin v. Commissioner*, T.C. Memo. 2012-26, 2012 WL 265887, at \*3 (excluding the testimony of the taxpayer's former representative who subsequently reviewed the taxpayer's books and records because he lacked firsthand knowledge of the relevant facts). Instead, his testimony summarized, and offered opinions on, otherwise admissible documents. Because Fernando's testimony is not relevant to the factual issues we must decide, we will exclude his testimony.

## II. *Fraud penalty*

"If any part of any underpayment of tax required to be shown on a return is due to fraud," section 6663(a) imposes a penalty of 75% of the portion of the underpayment attributable to fraud. The Commissioner

---

[7] The one count of obstruction of justice charged in the indictment was dismissed immediately before Walter's second trial.

**[\*8]** has the burden of proving fraud, and he must prove it by clear and convincing evidence. *See* § 7454(a); Rule 142(b).

To sustain his burden, the Commissioner must establish two elements: (1) that there was an underpayment of tax for each year in issue and (2) that at least some portion of the underpayment for each year was due to fraud. *See Hebrank v. Commissioner*, 81 T.C. 640, 642 (1983). When the Commissioner determines fraud penalties for multiple tax years, his burden of proving fraud "applies separately for each of the years." *Vanover v. Commissioner*, T.C. Memo. 2012-79, 2012 WL 952871, at \*3 (quoting *Temple v. Commissioner*, T.C. Memo. 2000-337, 2000 WL 1635406, at \*8, *aff'd*, 62 F. App'x 605 (6th Cir. 2003)).

The Commissioner bears the burden of production with respect to an individual taxpayer's liability for any penalty, requiring the Commissioner to come forward with sufficient evidence indicating that the imposition of the penalty is appropriate. *See* § 7491(c); *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001). As part of that burden, the Commissioner must produce evidence of compliance with the written supervisory approval requirement in section 6751(b). *See Graev v. Commissioner*, 149 T.C. 485, 492–93 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016).

Petitioners do not dispute the deficiencies determined for the years in issue which in turn gave rise to underpayments of tax; respondent thus has carried his burden with respect to the existence of underpayments. Respondent also has met his burden of production for purposes of section 6751(b). We turn to the existence of fraudulent intent.

III.    *Fraudulent intent*

Fraud is intentional wrongdoing designed to evade tax believed to be owing. *Neely v. Commissioner*, 116 T.C. 79, 86 (2001). The existence of fraudulent intent is a question of fact to be resolved upon consideration of the entire record. *Estate of Pittard v. Commissioner*, 69 T.C. 391, 400 (1977). Fraudulent intent is not to be presumed or based upon mere suspicion. *Petzoldt v. Commissioner*, 92 T.C. 661, 699 (1989).

Because direct proof of a taxpayer's intent is rarely available, fraudulent intent may be established by circumstantial evidence. *Id.* The Commissioner satisfies his burden of proof by showing that "the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes." *Parks*

[*9] *v. Commissioner*, 94 T.C. 654, 661 (1990). The taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent, and an intent to mislead may be inferred from a pattern of conduct. *Webb v. Commissioner*, 394 F.2d 366, 379 (5th Cir. 1968), *aff'g* T.C. Memo. 1966-81; *Stone v. Commissioner*, 56 T.C. 213, 224 (1971).

Courts often rely on various "badges of fraud" to find circumstantial evidence of fraudulent intent. *See Bradford v. Commissioner*, 796 F.2d 303, 307–08 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-601. These badges focus on whether the taxpayer engaged in conduct indicative of fraudulent intent, such as (1) understating income; (2) failing to maintain adequate records; (3) offering implausible or inconsistent explanations; (4) concealing income or assets; (5) failing to cooperate with tax authorities; (6) engaging in illegal activities; (7) providing incomplete or misleading information to the taxpayer's tax return preparer; (8) offering false or incredible testimony; (9) filing false documents, including filing false income tax returns; (10) failing to file tax returns; and (11) engaging in extensive dealings in cash. *See id.*; *Recklitis v. Commissioner*, 91 T.C. 874, 910 (1988); *Vanover v. Commissioner*, 2012 WL 952871, at *4. The existence of any one badge is not dispositive, but the existence of several badges is persuasive circumstantial evidence of fraud. *Niedringhaus v. Commissioner*, 99 T.C. 202, 211 (1992).

A.    *Mr. Caven's unavailability and implausible explanations or testimony*

We begin with Mr. Caven's unavailability because each party took advantage of his absence to offer a competing narrative of GSP's expense bookkeeping arrangement. Walter testified that he provided Mr. Caven with largely accurate records consistent with Mr. Caven's bookkeeping instructions. Respondent portrays Mr. Caven as unaware that Walter was assigning to personal expenses codes designated for business expenses.

A taxpayer's implausible or inconsistent explanations of his actions may constitute evidence of fraudulent intent. *See Bradford v. Commissioner*, 796 F.2d at 307. We may consider a taxpayer's filings and testimony as evidence of implausible or inconsistent explanations. *See Goldston v. Commissioner*, T.C. Memo. 2011-9, 2011 WL 94745, at *3–4. Providing testimony at trial that is not credible is a badge of fraud. *Beleiu v. Commissioner*, T.C. Memo. 2025-70, at *13 (citing *Morse

[*10] *v. Commissioner*, T.C. Memo. 2003-332, 2003 WL 22853796, at *4, *aff'd*, 419 F.3d 829 (8th Cir. 2005)).

We did not find Walter's explanation of GSP's bookkeeping practices plausible. The record also undermines Walter's testimony that Mr. Caven endorsed the expense arrangement. No written correspondence or other documents suggest that Mr. Caven knew about GSP's payment of Walter's personal expenses or how those expenses were recorded for bookkeeping purposes.[8] Mr. Caven created dozens of codes representing specific expense categories, including ones for officer compensation and shareholder draws from GSP. Against this backdrop it seems implausible that Mr. Caven instructed Walter to code personal expenses as business expenses such as material purchases and equipment rental. And if we instead assume, as petitioners urge, that the convoluted and misleading bookkeeping had Mr. Caven's blessing (or at the least was done with his knowledge), then all Walter has shown is that his accountant also was involved in the misdirection. We are unable on this record to foist responsibility for the fraud onto Mr. Caven and let Walter off the hook.

Moreover, Walter's stated rationale for the deception is far fetched. For example, Walter stated that he kept the inaccurate Internal Charts to hide GSP's payment of his personal expenses from other GSP employees who had access to the accounting software. Walter maintained that he disguised his personal expenses because there was "a lot of talk, a lot of envy" among GSP employees, and that, upon seeing GSP's payment of his personal expenses, they might request a raise.

Walter asks us to accept that he laboriously recoded hundreds of expenses, often multiple times, to avoid discovery by a few employees. This explanation falls apart with the slightest scrutiny. Walter assigned his personal expenses to a different payee even when GSP incurred business expenses in the same month from the same vendor. When asked how a GSP employee could identify certain expenses as personal when the payee for his personal expenses also was an existing vendor

---

[8] Petitioners point to personal financial statements that Mr. Caven prepared for Walter; these statements list the boat and recreational vehicle for which GSP paid the underlying loans. Knowing about these assets and the existence of the loans does not establish that Mr. Caven knew about, let alone endorsed, the recording of the loan payments in GSP's books as business expenses, particularly as he also gave Walter codes for officer loans and draws. While we might infer that Mr. Caven should have asked questions, he was not available to testify regarding his work. Thus we could not ask him whether his work for GSP included an audit of its books and records.

**[\*11]** for GSP, Walter only offered that he tried to keep his practices consistent.

It is more plausible that the Internal Charts represented an attempt to conceal from other GSP shareholders both the size and frequency of GSP's payment of Walter's personal expenses. Many of the expenses subsequently identified by Walter as personal fell outside the scope of the Board resolutions. Beyond the mislabeling of expenses, Walter omitted direct payments to himself and Juan Pablo from the Internal Charts. These allegations formed the basis of the shareholder-derivative suit brought by the Gottardi family that ultimately led to GSP's placement in receivership. A taxpayer's dishonesty in business transactions or willingness to defraud others may indicate a willingness to defraud the Commissioner. *Solomon v. Commissioner*, 732 F.2d 1459, 1462 (6th Cir. 1984), *aff'g per curiam* T.C. Memo. 1982-603; *McGee v. Commissioner*, 61 T.C. 249, 260 (1973), *aff'd*, 519 F.2d 1121 (5th Cir. 1975); *Ferguson v. Commissioner*, T.C. Memo. 2004-90, 2004 WL 605224, at \*17. And Walter identified nothing in the record that supported his story; emails from Mr. Caven that indicated GSP paid vehicle loans on behalf of Walter were consistent with the expenses authorized by the Board's resolution.

Walter's implausible testimony is indicative of fraudulent intent. His efforts to conceal the expense arrangement further suggest fraudulent intent. *See Rowlee v. Commissioner*, 80 T.C. 1111, 1124 (1983).

B. *Two sets of books*

Much of respondent's case in chief centered around GSP's two sets of books. Respondent contends that Walter's bookkeeping practices are strong proof of his concealment of income, failure to maintain adequate books and records, and provision of incomplete or misleading information to his tax preparer, among other badges of fraud. At trial Walter attempted to show that the books given to Mr. Caven and GSP's shareholders were accurate, but this was little more than a diversion. He did not explain why personal expenses were coded as business ones.

We have held consistently that keeping two sets of books is circumstantial evidence of fraudulent intent. *Benavides & Co., P.C. v. Commissioner*, T.C. Memo. 2019-115, at \*36–37; *Potter v. Commissioner*, T.C. Memo. 2014-18, at \*11; *Karcho v. Commissioner*, T.C. Memo. 2000-213, 2000 WL 964936, at \*10. Likewise a taxpayer's providing

**[\*12]** incomplete or misleading information to his return preparer provides circumstantial evidence of fraudulent intent. *Kohan v. Commissioner*, T.C. Memo. 2019-85, at \*24–25; *Vanover v. Commissioner*, 2012 WL 952871, at \*7.

Several documents relating to the expense arrangement are missing from the record. While Internal Charts for all years in issue are in the record, the 2009 and 2010 Accountant Charts are missing.[9] We also are unable to identify complete copies of GSP's check registers and general ledgers for each year.

Despite missing puzzle pieces, we readily conclude that Walter kept two sets of books: the Internal Charts and the Accountant Charts. The Internal Charts misidentified payees associated with checks issued for Walter's personal expenses. These charts of accounts periodically were shared with GSP's other shareholders, misleading them as to the nature of GSP's expenses.

Petitioners argue that the Internal Charts were kept to conceal GSP's payment of Walter's personal expenses from other GSP employees, not from Mr. Caven or the IRS. They note that only the Accountant Charts were transmitted to Mr. Caven. They thus reason that the existence of two sets of books is not evidence of fraudulent intent to evade tax.

This Court has concluded that a taxpayer's practice of double bookkeeping, even where the fraudulent set of books was kept for nontax purposes, is indicative of fraudulent intent. *Podlucky v. Commissioner*, T.C. Memo. 2022-45, at \*20–21, *aff'd*, No. 22-70169, 2024 WL 4234510 (9th Cir. Sep. 19, 2024). In *Podlucky* the taxpayer maintained a fraudulent second set of books to overstate the business's performance and defraud investors and creditors. *Id.* The taxpayer's fabrication of fraudulent checks, invoices, bank statements, and financial statements "supplie[d] strong evidence of fraudulent intent." *Id.* at \*21.

Regardless of what Mr. Caven was given, Walter's bookkeeping practices disguised GSP's payment of Walter's personal expenses as cost of goods sold and concealed Walter's receipt of income. Certain personal expenses in the Accountant Charts retained the inaccurate payee identity from the Internal Charts. And all personal expenses, regardless of the labeling of the payee's identity, were given inaccurate or

---

[9] Petitioners were unable to produce them, and respondent apparently failed to acquire them from Walter's criminal trial because of a recordkeeping error.

**[\*13]** misleading expense codes. For example, expenses for landscaping, audio/visual equipment, and renovations to petitioners' house were coded as equipment repair expenses in the Accountant Charts. Because these amounts were not labeled as compensation, GSP did not include these amounts in Walter's Forms W–2,[10] nor did petitioners report them on their Forms 1040.

Petitioners did not explain how Mr. Caven was to identify Walter's personal expenses from the myriad legitimate business expenses given the same code. Nothing in the Accountant Charts distinguished a personal Chase credit card payment as different from a business one. A taxpayer who relies on a return preparer may not withhold information from the return preparer and then "escape responsibility for the false tax returns which result." *United States v. Garavaglia*, 566 F.2d 1056, 1060 (6th Cir. 1977). At a minimum Walter's practice of double bookkeeping represents strong proof of providing incomplete or misleading information to Mr. Caven, a failure to maintain adequate records, and concealment of income.

C.    *Understatement of income*

Although a mere understatement of income does not constitute proof of fraud, the consistent and substantial understatement of income is strong evidence of it. *Truesdell v. Commissioner*, 89 T.C. 1280, 1302 (1987) (citing *Marcus v. Commissioner*, 70 T.C. 562, 577 (1978), *aff'd*, 621 F.2d 439 (5th Cir. 1980) (unpublished table decision)) (finding fraud where shareholder diverted corporate funds for shareholder's personal use during three tax years and failed to report the income on corporate and individual returns). Fraud may not be inferred from a deficiency in tax due to an honest mistake or poor judgment, *Iley v. Commissioner*, 19 T.C. 631, 635 (1952), but it may be found where the understatement is not satisfactorily explained or is not due to an innocent mistake, *Hatling v. Commissioner*, T.C. Memo. 2012-293, at \*12.

A corporation's payment of a shareholder's personal expenses generally constitutes taxable income to the shareholder, as either compensation or constructive dividends. *Barrington v. Commissioner*, T.C. Memo. 2022-68, at \*10–11; *see Helvering v. Horst*, 311 U.S. 112, 119 (1940) ("The dominant purpose of the revenue laws is the taxation of

---

[10] We note that the corporate minutes suggest certain payments to George and Juan Pablo were appropriately reported on Forms 1099.

**[\*14]** income to those who earn or otherwise create the right to receive it and enjoy the benefit of it when paid.").

Petitioners consistently and substantially underreported their income across the years in issue. While petitioners have conceded these deficiencies, they characterize their underpayments as the result of an honest mistake. At trial Walter maintained that he was not aware at the time that GSP's payment of his personal expenses constituted taxable income, and that he believed his expenses were being correctly reported on GSP's corporate returns.

As discussed above, we did not find Walter's explanations to be credible. The record demonstrates that the expense arrangement represented more than a genuine attempt at tax minimization. On a credit application for a Ferrari lease, Walter understood his actual income to be far greater than that reported to the IRS; he listed both his "Verifiable" income of $52,950, and his "Actual" income of $275,000.

Petitioners fare little better even if we accept Walter's version of events. Walter signed GSP's Forms 1120 for tax years 2009–11; by his own admission he did not thoroughly review them or inquire about their accuracy, despite his highly irregular bookkeeping practices. Nor did he inquire about the losses reported each year, for which his personal expenses often were responsible. "[A] trier of fact may infer that an individual knew of his or her evasion of tax from his or her willful blindness to the existence of that fact." *Fields v. Commissioner*, T.C. Memo. 1996-425, 1996 WL 530108, at \*14.

IV.    *Conclusion*

In sum we find clear and convincing evidence of fraud with respect to all years in issue.[11] Walter's practice of double bookkeeping, coupled with his implausible explanations and efforts to conceal from other shareholders, are highly indicative of fraud.

---

[11] Neither party addressed Mrs. Prezioso's role in the expense arrangement; we therefore make no finding that Mrs. Prezioso participated in any fraud. Nonetheless, spouses filing a joint federal income tax return are each fully responsible for the accuracy of their return and are jointly and severally liable for the entire tax found to be owed. *See* § 6013(d)(3); *Butler v. Commissioner*, 114 T.C. 276, 282 (2000).

**[*15]** We have considered all arguments made and, to the extent not addressed above, conclude that they are moot, irrelevant, or without merit.

Because of concessions,

*Decision will be entered under Rule 155.*